**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
LINDA YOUNG,

                    Plaintiff,              **MEMORANDUM OF**
                                         **DECISION & ORDER**
           -against-             15–cv–03569 (ADS)

CAROLYN COLVIN, Commissioner of Social
Security

                    Defendant.
--------------------------------------------------------X

<u>**APPEARANCES:**</u>

**Stanton & Guzman, LLP**
*Attorneys for the Plaintiff*
820 Hemstead Turnpike 2nd Fl.
Franklin Square, NY 11010
      By:    Stacey Rinaldi Guzman, Esq., Of Counsel

**United States Attorney's Office for the Eastern District of New York**
*Attorneys for the Defendant*
271 Cadman Plaza East
Brooklyn, NY 11201
      By:    Rukhsanah L. Singh, Assistant United States Attorney

**SPATT, District Judge**:

On June 18, 2015, the Plaintiff Linda Young (the "Plaintiff") commenced this civil action

pursuant to the Social Security Act, 42 U.S.C. § 405 *et seq.* (the "Act"), challenging a final

determination by the Defendant Acting Commissioner of Social Security Carolyn W. Colvin (the

"Commissioner"), that she is ineligible to receive Social Security disability insurance benefits.

Presently before the Court are the parties' cross motions, pursuant to Federal Rule of Civil

Procedure ("FED. R. CIV. P." or "Rule") 12(c) for judgment on the pleadings. For the reasons that

follow, the Plaintiff's motion is denied in its entirety and the Commissioner's motion is granted in

its entirety.

# I. BACKGROUND

## A. Procedural History

The Plaintiff, 51 years of age, applied for disability insurance benefits on December 12, 2012, alleging an inability to work as of April 5, 2012 due to back pain, diabetes, hypertension, gallbladder issues, chronic cholecystitis, and leg pain. The Social Security Administration (the "SSA") denied her application, and the Plaintiff requested a hearing.

On January 6, 2014, Administrative Law Judge April M. Wexler ("ALJ Wexler" or "the ALJ") of the SSA held a hearing. On February 19, 2014, ALJ Wexler issued a decision denying the Plaintiff's claim. The SSA Appeals Council denied the Plaintiff's request to review the ALJ's decision on April 24, 2015, and the ALJ's decision therefore became the SSA Commissioner's final decision.

As stated above, the Plaintiff commenced this civil appeal on June 18, 2015. On March 11, 2016, the parties' cross-motions for judgment on the pleadings were fully submitted to the Court.

## B. The Administrative Record

### 1. Non-Medical Evidence

#### a. The Application

The Plaintiff was born in 1962. As of the date of her application, she reported that she was 5'7" and 220 pounds. In her application, she said that she became unable to work on April 5, 2012 because of her disabling condition. Specifically, she listed the following maladies: back pain, diabetes, hypertension, gallbladder, chronic cholecystitis, and leg pain.

The Plaintiff worked primarily as a counselor. From November 2001 through April 2012, she worked as a mental health counselor with several organizations. She worked for Seafield Services Inc. ("Seafield") from July 2006 until April 6, 2012.

In a Work History Report, the Plaintiff stated that as part of her responsibilities as a counselor at Seafield, she sat with groups, took notes, consulted, and moved files. The job did not require the use of machines, tools or equipment. It did require writing and completing reports. She said that on a normal day, she would walk for 4 hours; stand, sit and stoop for 2 hours; kneel and crouch for 1 hour. The Court notes that this would add up to approximately 10 hours. The Plaintiff indicated that she worked 8 hours a day. The Plaintiff noted that the heaviest weight that she lifted was 20 pounds, and that she frequently lifted 10 pounds.

At the time of the application, the Plaintiff was taking decadron for diabetes; and gabapentin and oxycodone for pain.

### b. The Function Report

On January 14, 2013, the Plaintiff completed a function report in conjunction with her disability benefits application. She indicated that she lived in a house with her family. The Plaintiff was able to care for her personal hygiene; but it was difficult to shower longer than ten minutes; it took her a long time to get dressed and put socks and shoes on; and she could not curl her hair. She made dinner every two to three days by cooking fast and easy meals. She indicated that she cared for her husband and her daughter, and that she helped her daughter with her homework. Plaintiff could not stand for a long time; could not walk; play sports; go shopping; prepare meals; clean the entire house; or do laundry. Her husband helped complete these tasks. She was able to shop for toiletries, medications, paper products, and vegetables about two to three

times per month, limited to one to two hours. She could not sweep, rake, or perform household repairs.

Further, the Plaintiff could occasionally drive, and would go outside four to five times per week. She was able to go outside alone. She went to church two to three times a month, but sometimes had to leave early due to back pain. She could stand for ten minutes; lift ten pounds; and walk 50 feet. After walking fifty feet, she said that she needed to rest for ten minutes. She could sit for 25 minutes before standing or repositioning herself. She had trouble climbing stairs and could not kneel or squat. She had no difficulty reaching or using her hands. She complained of numbness in her right leg. She used a cane, brace/splint, and a transcutaneous electrical nerve stimulation ("TENS") unit three to four times daily. As a result of the pain and numbness, she said that she had difficulty completing tasks.

### c. The Disability Report Appeal Form

On April 4, 2013, the Plaintiff completed a disability report appeal form, in which she stated that there had been no changes in her condition. She indicated that she was taking Nexium for heartburn, and did not list any other medications.

### d. The Plaintiff's Testimony at the Administrative Hearing

On January 6, 2014, Plaintiff testified at the administrative hearing. She testified that she was injured on September 14, 2009, when she bent down to pick up a chart at work. She heard a loud pop in her back, and was unable to stand up. Between 2009 and 2012, she took about ten days off using either personal or sick days, but it was only when she had a "really bad day." She testified that during that period, she had difficulty performing her duties because she could not sit for ninety minutes, which was the length of her counseling group sessions at Seafield. She found

her job to be more difficult as time went on.  The Plaintiff began seeing a pain management doctor, Dr. Ali Guy, in 2009.

She stopped working on April 6, 2012, because her back "went out" during a trip to visit her mother-in-law in Alabama.  She returned home and had a discectomy on April 26, 2012.  Her surgeon, Dr. Matthew Kern, informed her that he operated on her leg instead of her back so that she could walk.  He explained to her that she would have numbness and tingling, and hot and cold sensations in her leg for the rest of her life.

After the surgery, the Plaintiff underwent physical therapy and was also treated with epidural injections.  She last attended physical therapy six months prior to the hearing.  She also used a TENS machine, a back brace, and a cane.  Plaintiff stopped taking medications because they were too addictive.

The Plaintiff testified that on a good day, she would wake up and make breakfast for her husband—which was two to three times a week.  She was able to take showers or bathe herself, but said that her husband had to help her get into the high walled Jacuzzi tub.  She swept the floor with breaks and vacuumed when it was convenient.  She and her husband used paper plates and plastic utensils so no one had to do any dishes.  She did the laundry, but her husband had to bring the clothes down the stairs.

The Plaintiff testified that she went outside on most days to get the mail; to go to certain appointments; to go food shopping; to go to the drugstore or post office; and to see her grandchildren.  She said that she did not take her children to the park because she would be unable to get them if they ran.  She had gone out to socialize with friends, but not recently because she lost her oldest son.

The Plaintiff further testified that she has constant sharp pain in her lower back and right thigh with numbness, tingling, and spasms. The muscle spasms in both legs would last from 30 second to two minutes. She said that she could sit comfortably for half-an-hour and could stand for 15 minutes. She could walk for 50 feet and could lift ten to 15 pounds. Plaintiff would spend about 30 minutes outside the house for errands, usually accompanied. She could drive for about 20 minutes and had trouble putting on her shoes and fixing her hair. The Plaintiff said that she had difficulty sleeping—that she has to wake up every hour to reposition herself.

### e. Vocational Expert Edna F. Clark's Testimony at the Administrative Hearing

Edna F. Clark ("Clark"), an impartial vocational expert, also testified at the administrative hearing. Clark said that an individual of Plaintiff's age, education, and work experience who: was limited to sedentary work; could occasionally lift ten pounds; could sit for up to six hours; could stand or walk for approximately two hours in an eight-hour day with normal breaks; could occasionally climb ramps or stairs; could never climb ladders, ropes, or scaffolds; could occasionally balance and stoop; could never kneel, crouch, or crawl; could push and pull without limitation; and would need to use a cane for ambulation, could work as a counselor as the Plaintiff had previously.

However, Clark testified that if that same individual could only sit for four hours and stand and walk for two hours, he or she would be unable to perform the Plaintiff's previous job or any other job in the national economy.

### 2. The Medical Evidence

### a. Before April 5, 2012

On December 6, 2007, a magnetic resonance imaging ("MRI") of the Plaintiff's spine showed straightening of the normal lumbar lordosis; disc desiccation of the L2–3, L3–4 and L4–5

discs; right neural foraminal disc herniation at the L2–3 disc level; a herniated disc at the left posterior and left lateral disc margin causing assymetric compression of the thecal sac at L3–4 disc level; a broad-based herniated disc at the L4–5 disc level compressing on the thecal sac; and a slight bulging of annulus of disc at L5–S1.  (R. at 201).

An X-ray on September 28, 2009, showed mild spondylosis and no evidence of fracture or listhesis.

An MRI on November 6, 2009 showed degenerative disc disease along with herniation and disc bulging.  The bulging was narrowing one of the neural canals and impinging upon a nerve root.

Dr. Barbara Whelan, a chiropractor, treated the Plaintiff from September 2009 until November 2009.

Dr. Ali Guy began treating the Plaintiff in November 2009.  Dr. Guy is a pain management physician.  Dr. Guy gave the Plaintiff epidural injections and prescribed physical therapy.

On April 27, 2010, October 12, 2010 and October 18, 2011, Dr. Peter Jemian, an orthopedic surgeon, examined the Plaintiff on behalf of the Workers' Compensation board.  Dr. Jemian also reviewed the Plaintiff's medical records.  Dr. Jemian's clinical findings were that the Plaintiff had a lumbar sprain with pre-existing degenerative disc disease, with central disc herniations at discs L2–S1 and L4–5, and encroachment of the left L3 nerve root; and right lumbar radiculopathy.  Dr. Jemian noted that the Plaintiff was currently working full duty, with restrictions, as of October 18, 2011, and that she said that she had not missed any time at work.  He recommended that she revisit with a pain management consultant and receive an epidural injection, but did not believe that further physical therapy was necessary.  Dr. Jemian noted that the Plaintiff walked without assistance, and determined that her degree of disability was mild.

### b. After April 5, 2012

On April 6, 2012, the Plaintiff went to the Emergency Department at DCH Health System in Tuscaloosa, Alabama, complaining of lower back pain. The Plaintiff was diagnosed with acute chronic low back pain and was given hydrocodone/acetaminophen, ketorolac, and orphenadrine for her pain. She was discharged the same day and was given a prescription for tramadol.

On April 7, 2012, the Plaintiff returned to Dr. Guy. He noted that she had been off Xanax for two to three weeks, and that she was taking acarbose and metformin for her diabetes, and Nexium for gastroesophageal reflux disease ("GERD"). Dr. Guy's physical evaluation of the Plaintiff revealed that she was experiencing diffuse tenderness and spasms. He diagnosed her with degenerative joint disease and prescribed oxycodone.

On April 10, 2012, the Plaintiff told Dr. Guy that her lower back pain had increased over the course of four days. The pain radiated to her right leg, and she was experiencing numbness and tingling in her right thigh. Dr. Guy observed that the Plaintiff had a reduced range of motion in her neck and back, and that her gait was slow. He prescribed Flexeril and tramadol for pain; a straight cane; and ordered an MRI. He also administered a lidocaine injection into the Plaintiff's back. Dr. Guy advised Plaintiff to go to the hospital if the symptoms worsened.

On April 11, 2012, the Plaintiff went to Brookhaven Memorial Hospital for low back pain radiating to her right leg with numbness and tingling. The Plaintiff was admitted to the hospital and was not discharged until May 10, 2012. An April 11, 2012 a lumbar spine MRI revealed a small disc component in the right neural foramina at L2-L3; a mild far lateral disc bulge at L2-L3; and a right far lateral disc bulge at the level of L3-L4 causing mild abutment of the exiting nerve. On April 20, 2012, the Plaintiff began taking Humalog for her diabetes. An MRI on April 22, 2012, revealed multilevel mild spondylotic changes of the Plaintiff's lumbar spine, most prominent

at the L3/4 level.  On April 26, 2012, the Plaintiff underwent a right L2-3 far lateral discectomy.

The surgery was performed by Dr. Matthew Kern.  After the surgery, the Plaintiff developed a

fever and cholecystitis; had raised liver enzymes; and edema of the gallbladder wall.  The Plaintiff

had her gallbladder removed on May 5, 2012.

On May 10, 2012, the Plaintiff was discharged from Brookhaven Memorial Hospital.  Her

final diagnosis upon discharge was status-post L2–L5 discectomy, status-post laparoscopic

cholecystectomy, and a hepatitis C infection.  Her discharge medication included Nexium,

Flexeril, Lopressor, Zocor, Metformin, Altace, OxyContin, Neurontin, Kombiglyze XR, Actos,

and Humalog.  She was not given any discharge instructions, except to engage in physical therapy

at home.  The Plaintiff informed the hospital that she did not have a primary care doctor, but that

she was looking for one, and that she would follow up with Dr. Guy.

The Plaintiff followed up with Dr. Kern on May 17, 2012.  Dr. Kern indicated that the

Plaintiff was improving but was still quite disabled and unable to work.  He prescribed

"aggressive" physical therapy for two months to get her back to work.

On May 29, 2012, the Plaintiff again saw Dr. Guy.  He noted that the Plaintiff was walking

with a walker.  The Plaintiff complained of back pain and neck pain.  She rated her back pain

between 6 and 7 on a scale of 10, and her neck pain between 2 and 3.  Dr. Guy's examination

revealed diffuse tenderness, spasms, trigger pints, reduced range of motion in her back and neck,

and positive straight leg raises.  He prescribed Flexeril, OxyContin, home exercise, and physical

therapy.

On June 14, 2012, the Plaintiff followed up again with Dr. Kern.  She told him that she was

experiencing severe low back pain; could hardly stand for ten minutes; and still had numbness and

burning in her right thigh. Dr. Kern ordered a repeat MRI and x-rays of Plaintiff's back and an erythrocyte sedimentation rate test to determine if she had early osteomyelitis.

An MRI was taken of the Plaintiff's lumbar spine on June 21, 2012. The radiologist said that MRI revealed an L2-L3 right posterolateral annular tear and mild bulge with right intraforaminal asymmetry, with enhancing granulation tissue, abutting the existing right L2 nerve root. There was no evidence of recurrent disc herniation, and there was mild disc bulging **at** L3-L4 to L5-S1.

On June 26, 2012, the Plaintiff told Dr. Guy that her lower back pain radiating to her right leg was a 9 out of 10, and her neck pain registered at a 7 out of 10. Dr. Guy's examination was consistent with his previous examinations: namely, diffuse tenderness, spasms, trigger points, reduced range of motion in the neck and back, and positive straight leg raises.

The Plaintiff returned to Dr. Kern on June 28, 2012. Dr. Kern examined the June 21st MRI and noted that the fragment on the right at L2-L3 had been removed. The Plaintiff "actually [] complained that she cannot walk and she cannot stand for very long because of the low back pain." Dr. Kern noted that the MRI showed that there was some dehydration at certain disc levels, with some bulging discs and spondylosis, but there was not any evidence of instability. Dr. Kern said that he would not perform further surgery. He referred her to Dr. Sarij for treatment and pain management, noting that the treatment would likely consist of epidural steroids.

Dr. Guy gave the Plaintiff an epidural injection on July 20, 2012. Before the injection, Dr. Guy's diagnosis was disc herniation at the L4-L5 disc levels, right L5 radiculopathy, and bulging at L2-L4.

On July 24, 2012, Denise Fairchild, a physician's assistant in Dr. Guy's office wrote a letter for the Plaintiff on behalf of Dr. Guy. It was addressed "To Whom It May Concern," and stated

that the Plaintiff was under care for injuries sustained on September 14, 2009. The letter indicated that the Plaintiff had L4-L5 disc herniation; L2-L4 disc bulge; right L5 lumbar radiculopathy; traumatic myofascial pain syndrome; and that she was "totally disabled," and "unable to work until further notice."

The Plaintiff returned to Dr. Kern on August 2, 2012. The Plaintiff said that she was still having some leg discomfort. Dr. Kern noted that this is a side effect in the far lateral discs. He recommended a right L2 nerve root block. He filled out a form stating that she should return to work on August 15, 2012, light duty, with a 15 pound weight restriction. Dr. Kern said that the Plaintiff did not need to see him again unless something changed.

On August 14, 2012, the Plaintiff returned to Dr. Guy, complaining of lower back pain. His examination revealed results similar to his previous examinations: tenderness, spasms, trigger points, reduced range of motion in her back, positive standard leg raises, and reduced strength. Dr. Guy noted that the Plaintiff had violated their treatment agreement and that he would not prescribe any more narcotic medications for her.

Dr. Guy completed a Doctor's Progress Report for the Workers' Compensation Board on August 14, 2012, where he stated that the Plaintiff was unable to return to work because of recent surgery. He said that the Plaintiff needed approximately eighteen more sessions of physical therapy. Dr. Guy listed her diagnoses as thoracic or lumbosacral neuritis, and myalgia and myositis, unspecified. He wrote that her temporary impairment was 100%.

On September 25, 2012, Dr. Guy examined the Plaintiff again. She complained of back pain radiating to her left leg. Dr. Guy found tenderness and spasms in the Plaintiff's back and neck; trigger points in her back; reduced range of motion in her back; positive straight leg raises; and antalgic gait. Dr. Guy prescribed Neurontin to the Plaintiff.

On November 15, 2012, Dr. Samuel Thampi examined the Plaintiff on behalf of the Workers' Compensation Board. The Plaintiff told Dr. Thampi that she was experiencing lower back pain which was radiating into her lower extremities. She graded her pain at a 6 out of 10, and said that it was worse when she sat, stood, went up the stairs, sneezed, and coughed. The Plaintiff said that she smoked about a pack of cigarettes each day, and that she was taking the following medications daily: Nexium, Antabuse, metformin, Neurontin, Actifed, cyclobenzaprine, and Percocet. She said that she does not drink. The Plaintiff informed Dr. Thampi that she had four epidural steroid injections, that the first one had given her 80% relief, and the second had given her four weeks of relief. The Plaintiff walked with a cane and a limp, but Dr. Thampi noted that she did not appear to be in any acute distress.

Dr. Thampi's examination of the Plaintiff's lumbar spine revealed bilateral sacroiliac joint tenderness. The Plaintiff was able to flex her lumbar spine so that the tips of her fingers could touch the middle third of her legs. Her left anterior superior iliac joint reveled a Tinel's sign. The Patrick's test was positive on the left side. Dr. Thampi's impression was left sacroiliac joint dysfunction; left meralgia paresthetica (nerve compression); and lumbar radiculopathy. He recommended a one-time cortisone injection into the left sided sacroiliac joint within four weeks, and further medical management of pain with Neurontin. Dr. Thampi did not recommend any further epidural steroid injections. He noted that the Plaintiff could return to work on light duty— lifting no more than 10 pounds on a frequent basis and no more than 20 pounds on an occasional basis.

On November 27, 2012, the Plaintiff was examined again by Dr. Guy. She complained of neck and back pain radiating to her shoulders and legs, with numbness and tingling in the right hand and leg. His examination revealed tenderness and spasms in her back and neck; trigger points

in her back; a reduced range of motion in her back; positive straight leg raises; and antalgic gait with cane.

On March 14, 2013, Dr. Ammaji Manyam, an internist, examined the Plaintiff on behalf of the SSA. The Plaintiff's chief complaints were high blood pressure, diabetes mellitus, back pain due to a herniated disc, tingling and numbness in the right leg, and gastroesophageal reflux disease. The Plaintiff told Dr. Manyam that she has never smoked and only drinks occasionally. She said that she was taking antacids for her stomach, and Vicodin and Naprelan for pain. The Plaintiff related to Dr. Manyam that she did not cook or clean much; that she shopped once a week, showered and dressed herself seven times a week; and that her family helped her with laundry and other chores.

Dr. Manyam noted that the Plaintiff did not appear to be in any acute distress; her gait was normal; she could walk on her heels and toes without difficulty; she had a normal stance; did not need assistance changing, mounting or dismounting from the changing table; was able to squat two-thirds of the way down; and she was able to rise from her chair without difficulty.

Dr. Manyam diagnosed the Plaintiff with low back pain with right sciatica following a lumbar discectomy; history of herniated lumbar disc; hypertension; diabetes mellitus type 2; and GERD. He noted that the Plaintiff had mild limitations for prolonged walking, standing, sitting, climbing stairs, pushing, pulling, and carrying weights.

Dr. Guy saw the Plaintiff several more times between April 23, 2013 and December 31, 2013. On six dates, April 25, 2013, May 23, 2013, June 7, 2013, August 13, 2013, and December 31, 2013, Dr. Guy completed additional Doctor's Progress Reports for the Workers' Compensation Board. His reports were the same as the one he submitted on August 14, 2012, except that he noted that the Plaintiff needed a new MRI and more epidural injections, and added a diagnosis of

displacement of the lumbar intervertebral disc on the August 13th report. An MRI of the Plaintiff's lumbar spine on July 13, 2013 did not show any changes in the Plaintiff's condition from the MRI taken on June 21, 2012. Dr. Guy also prescribed Cymbalta and Lyrica to the Plaintiff during this time, and referred her for Suboxone.

On December 31, 2013, Dr. Guy completed a Physical Residual Functional Capacity Questionnaire. Dr. Guy indicated that he had been treating the Plaintiff since December 2009 and that his prognosis was guarded. When asked to list the Plaintiff's symptoms, he listed one: radicular lower back pain – down the right leg with numbness and tingling. Dr. Guy noted that the Plaintiff had tried physical therapy, medications, and injections. He said that when the Plaintiff took Percocet, it caused her to experience dizziness and cognitive deficits. Dr. Guy cited an EMG and MRI as supporting his assessment.

As to the Plaintiff's abilities at the time, Dr. Guy said that the Plaintiff could sit for a half hour or less at a time, for a total of two hours or less per day; stand/walk for a half hour or less at a time, for a total of one hour or less per day; needed to recline frequently during an eight-hour workday; occasionally lift/carry up to 10 pounds; reach occasionally, but not bend or squat; and use her hands and arms for fine manipulation, simple grasping/gripping, pushing/pulling arm controls, and repetitive overhead reaching. Dr. Guy said that the Plaintiff could not use her feet to operate foot controls. As to a disability determination, Dr. Guy believed that the Plaintiff could only perform less than the full range of sedentary work.

## C. The February 19, 2014 Decision of ALJ Wexler

In this action, the Plaintiff challenges the ALJ's findings contained in a February 19, 2014 written decision (the "Underlying Decision").

In the Underlying Decision, the ALJ found that the Plaintiff meets the insured status requirements of the Act through December 31, 2016; she has not engaged in substantial gainful activity since April 5, 2012; she has severe impairments of back impairment and obesity; and those impairments do not meet the criteria of impairments listed in Appendix 1 to 20 C.F.R. Part 404, Subpart P. The ALJ found that the Plaintiff has the residual functional capacity (the "RFC") to perform less than the full range of sedentary work as defined in 20 C.F.R. § 404.1520(e) in that the Plaintiff "can occasionally lift pounds; sit for approximately six hours; stand or walk for approximately two hours in an 8 hour day with normal breaks; occasionally climb ramps or stairs; never climb ladders, ropes or scaffolds; occasionally balance and stoop[;] never kneel, crouch or crawl[;] [has] unlimited [ability to] push/pull[;] and has the need for the use of a cane for ambulation." (R. at 12–13). Finally, the ALJ found that despite the Plaintiff's impairment, taking the Plaintiff's RFC into account, the Plaintiff is capable of performing her previous job as a counselor, and therefore she is not disabled.

In the Underlying Decision, ALJ Wexler afforded great weight to the medical opinions of Dr. Kern, Dr. Thampi and Dr. Manyam. ALJ Wexler afforded less weight to the medical opinion of Dr. Guy, because his opinion was inconsistent with the opinions of the other doctors who examined the Plaintiff.

**D. The Present Appeal**

In her appeal, the Plaintiff argues that 1) the Underlying Decision failed to give the proper weight to the evidence from her treating physician, Dr. Guy; 2) the Underlying Decision lacks the support of substantial evidence; 3) the Underlying Decision failed to properly evaluate the Plaintiff's subjective complaints of pain.

The Commissioner contends that these arguments lack merit; that the ALJ applied the proper legal standards; and that substantial evidence in the record supports the denial of benefits.

## II. DISCUSSION

### A. Applicable Law

The Act defines the term "disability" to mean an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." *Burgess v. Astrue*, 537 F.3d 117, 119 (2d Cir. 2008) (quoting 42 U.S.C. § 423(d)(1)(A)) (quotation marks omitted). In addition, "[t]he impairment must be of 'such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.' " *Shaw v. Chater,* 221 F.3d 126, 131–32 (2d Cir. 2000) (quoting 42 U.S.C. § 423(d)(2)(A)).

In determining whether a claimant is disabled, the Commissioner is required to apply the five-step sequential process set forth in 20 C.F.R. § 404.1520. *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir. 1999). The claimant bears the burden of proving the first four steps, but then the burden shifts to the Commission at the fifth step. *Rosa,* 168 F.3d at 77. First, the Commissioner considers whether the claimant is presently working in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i); *Rosa,* 168 F.3d at 77. If the claimant is not so engaged, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii); *Rosa,* 168 F.3d at 77. If the severity requirement is met, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in Appendix 1 of the regulations, or is equal to a listed impairment. 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Part 404, Subpart P, Appendix 1; *Rosa,*

168 F.3d at 77.  If the claimant has such an impairment, there will be a finding of disability.  If not, the fourth inquiry is to determine whether, despite the claimant's severe impairment, the claimant's residual functional capacity allows the claimant to perform his or her past work.  20 C.F.R. § 404.1520(a)(4)(iv); *Rosa,* 168 F.3d at 77.  Finally, if a claimant is unable to perform past work, the Commissioner then determines whether there is other work, such as "light work" discussed *infra,* that the claimant could perform, taking into account, *inter alia,* the claimant's residual functional capacity, age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(v); *Rosa,* 168 F.3d at 77.

## B.  The Standard of Review

"Judicial review of the denial of disability benefits is narrow" and "[t]he Court will set aside the Commissioner's conclusions only if they are not supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."  *Koffsky v. Apfel*, 26 F. Supp. 475, 478 (E.D.N.Y. Nov. 16, 1998) (Spatt, *J.*) (citing *Bubnis v. Apfel*, 150 F.3d 177, 181 (2d Cir. 1998)).

Thus, "the reviewing court does not decide the case *de novo.*"  *Pereira v. Astrue*, 279 F.R.D. 201, 205 (E.D.N.Y. 2010).  Rather, "the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive," *id.*, and therefore, the relevant question is not "whether there is substantial evidence to support the [claimant's] view"; instead, the Court "must decide whether substantial evidence supports *the ALJ's decision.* "  *Bonet v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) (emphasis in original).  In this way, the "substantial evidence" standard is "very deferential" to the Commissioner, and allows courts to reject the ALJ's findings " 'only if a reasonable factfinder would *have to conclude otherwise.*' "  *Brault v. SSA*, 683 F.3d 443, 448 (2d Cir. 2012) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994) (emphasis in original)).  This deferential standard applies not only to factual determinations, but also to inferences and

conclusions drawn from such facts." *Pena v. Barnhart*, No. 01-cv-502, 2002 U.S. Dist. LEXIS 21427, at *20 (S.D.N.Y. Oct. 29, 2002) (citing *Levine v. Gardner*, 360 F.2d 727, 730 (2d Cir. 1966)).

In this context, " '[s]ubstantial evidence' means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Burgess*, 537 F.3d at 128 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004)). An ALJ's findings may properly rest on substantial evidence even where he or she fails to "recite every piece of evidence that contributed to the decision, so long as the record 'permits [the Court] to glean the rationale of [his or her] decision.' " *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). This remains true "even if contrary evidence exists." *Mackey v. Barnhart*, 306 F. Supp. 337, 340 (E.D.N.Y. 2004) (citing *DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998), for the proposition that an ALJ's decision may be affirmed where there is substantial evidence for both sides).

The Court is prohibited from substituting its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review. *See Koffsky*, 26 F. Supp. at 478 (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)).

## C. Application to the Facts Of This Case

### 1. As to Whether the ALJ Properly Used the Treating Physician's Rule

The Plaintiff argues that the ALJ committed reversible error by failing to give controlling weight to Dr. Guy's opinions. Specifically, the Plaintiff argues that the ALJ failed to explicitly state what level of weight was assigned to Dr. Guy's opinion, or to even consider the factors ALJs must utilize when overriding a treating physician's opinion. The Commissioner argues that although the ALJ did not explicitly apply the factors, she applied the substance of the factors,

afforded the proper weight to Dr. Guy's opinion, and "the substance of the treating physician rule was not traversed." (Commissioner's Brief at 18 (citing *Halloran*, 362 F.3d at 32). The Court agrees with the Commissioner.

"The method by which the Social Security Administration is supposed to weigh medical opinions is set forth at 20 C.F.R. § 404.1527[c]." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). Relevant here, "[t]he regulations say that a treating physician's report is generally given more weight than other reports and that a treating physician's opinion will be controlling if it is 'well-supported by medically acceptable [evidence] and is not inconsistent with the other substantial evidence in [the] record.' " *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)).

This rule — the "Treating Physician Rule" — reflects the generally-accepted view that "the continuity of treatment [a treating physician] provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient." *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (quoting *Mongeur*, 722 F.2d at 1039 n.2 (internal quotation marks omitted)); *see Genier v. Astrue*, 298 F. App'x. 105, 108 (2d Cir. 2008) (noting that the regulations recognize that treating physicians "are likely to be the medical professionals most likely to provide a detailed, longitudinal picture of ... medical impairment" (quoting 20 C.F.R. § 416.927(d)(2))).

Generally, where the ALJ declines to give controlling weight to a treating physician's opinion, he must provide the claimant with "good reasons" for doing so, and must consider various factors to determine how much weight to give the opinion. *See Blanda v. Astrue*, No. 05-cv-5723, 2008 U.S. Dist. LEXIS 45319, at *18, 2008 WL 2371419 (E.D.N.Y. June 9, 2008); 20 C.F.R. § 404.1527(c)(2). In particular, "to override the opinion of the treating physician, [the Second Circuit] ha[s] held that the ALJ must explicitly consider, *inter alia*, (1) the frequen[cy], length,

nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129).

Where a treating physician's opinion is contradicted by substantial evidence in the record, the opinion will not be afforded controlling weight. *Snell,* 177 F.3d at 133 ("When other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling."). Additionally, findings that "a claimant is disabled and cannot work . . . are reserved to the Commissioner," and a treating physician's opinion on these points is not afforded controlling weight. *Id.* at 133 (internal citations omitted); *see also* 20 C.F.R. § 404.1527(e)(1). Thus, the ALJ "considers the data that physicians provide but draws [his or her] own conclusions as to whether those data indicate disability ." *Snell,* 177 F.3d at 133.

Here, the ALJ said that she afforded "less weight" to the opinion of Dr. Guy because it was "not consistent with the opinions of Dr. Kern, Dr. Thampi and the opinion of Dr. Manyam contained in Exhibits 6F, 7F and 8F. In addition, it is inconsistent with the claimant's activities of daily living which are described above and her lack of any medication for her condition." (R. at 17). In contrast, the ALJ afforded "great weight" to Dr. Kern's findings and Dr. Manyam's opinion, and "some weight" to Dr. Thampi's opinion. (R. at 16, 17). The Plaintiff's testified, as the ALJ noted in her decision, that she generally "wakes up, makes breakfast for her husband, dresses and showers with assistance from her husband, occasionally drives, sweeps, dusts, dishes, helps with laundry, occasionally socializes, goes out daily, goes to doctor appointments, shops, visits grandchildren and great grandchildren and perform[s] general errands." (R. at 14). The ALJ also noted that the Plaintiff reported in her function report in January 2013 that "she is able to dress and bathe herself, make her bed, clean a little and makes dinner for her daughter and husband, She

stated that she goes out 4-5 times per week, can drive, go out alone, shop in stores and attends church 2-3 times per month." (*Id.*)

Although the ALJ did not explicitly consider the factors mentioned above, *see Selian*, 708 F.3d at 418, the Court "deduce[s] that the ALJ considered the treating physician's opinion and explained the consistency of [the treating physician's] opinion 'with the record as a whole,'" and therefore "the ALJ applied the substance of the treating physician rule." *Halloran.* 362 F.3d at 31–32 (citing 20 C.F.R. § 404.1527(d)(4)). In *Halloran*, faced with similar circumstances, the Second Circuit conducted "a searching review of the record to assure [that the claimant] received the rule's procedural advantages." *Id.* Although the court noted that it does not "hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion," *id.,* because the court found that the ALJ nonetheless "applied the substance of the treating physician rule," *id.,* the court found no reason to remand because "the substance of the treating physician rule was not traversed." *Id.* at 32–33; *see also Camille v. Colvin*, 652 F. App'x 25, 28 (2d Cir. 2016) (summary order) (stating that "[a]lthough the ALJ did not describe in detail her rationale, we can infer from the decision" the weight she attributed to each doctor's opinion); *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) ("Finally, [the plaintiff] challenges the ALJ's failure to review explicitly each factor provided in 20 C.F.R. § 404.1527(c). We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear."); *Petrie,* 412 F. App'x at 406 ("[W]here the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." (internal citations and quotations omitted)); *Fontanarosa v. Colvin*, No. 13-cv-03285, 2014 WL 4273321,

at *9 (E.D.N.Y. Aug. 28, 2014) ("[T]he ALJ is not required to explicitly discuss the factors, but it must be clear from the decision that the proper analysis was undertaken."); *compare Sanders v. Comm'r of Soc. Sec.,* 506 F. App'x 74, 77 (2d Cir. 2012) (summary order) (stating that failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand");

Here, the ALJ acknowledged that Dr. Guy was a pain management specialist and had treated the Plaintiff since 2009, but nonetheless assigned less weight to Dr. Guy's opinion, and gave reasons for doing so. The Court finds that this was not only a proper statement, but was supported by the evidence. *See Burgin v. Astrue*, 348 F. App'x 646, 649 (2d Cir. 2009) (summary order) (stating that an ALJ must "provide good reasons for giving [the treating physician's] opinion more or *less weight* than the other medical evidence.") (emphasis added). Dr. Guy's medical opinion was contradicted by the medical opinions of three other doctors—Dr. Kern, Dr. Thampi and Dr. Manyam. *See Petrie*, 412 F. App'x at 405–06 (the medical opinions submitted by [the treating physician] were contradicted by those of several medical experts."); *Halloran*, 362 F.3d at 32 ("the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." (citing *Veino v. Barnhart,* 312 F.3d 578, 588 (2d Cir. 2002)).

Those three doctors all reviewed the June 21, 2012 MRI, which Dr. Guy supposedly relied on in his Residual Functional Capacity report in December 2013. As noted above, the Plaintiff's July 13, 2013 MRI did not show any changes from the June 21, 2012 MRI. Dr. Guy's reliance on the EMG is also misplaced because the EMG was taken in November 2009, before the alleged onset date of April 5, 2012. Furthermore, as the ALJ noted, Dr. Guy's opinion was contradicted

by the Plaintiff's own statements about her daily activities, as well as the fact that the Plaintiff was not taking any medication at the time of the hearing nor had she received physical therapy in the six months preceding the hearing.

The Court also finds unpersuasive the Plaintiff's argument that remand is warranted because the ALJ did not fully develop the record. The Plaintiff "does not point to, nor do we find, any 'deficiencies' or 'obvious gaps' in the administrative record. To the contrary, the voluminous record is replete with [the Plaintiff's] medical records detailing the course of [her] impairments and treatment. The ALJ was therefore under no obligation to seek additional information from [the Plaintiff's] treating sources." *Petrie*, 412 F. App'x at 406; *see also Halloran*, 362 F.3d at 32-33 (stating that remand was unnecessary because the ALJ gave good reasons for the weight assigned to the treating physicians' opinion); *Duran v. Colvin*, No. 14-cv-8677, 2016 WL 5369481, at *12 (S.D.N.Y. Sept. 26, 2016) ("As long as the ALJ provides 'good reasons' for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted." (internal citations and quotations omitted)).

Therefore, the Court finds that the ALJ appropriately applied the treating physician rule and gave proper weight to Dr. Guy's opinion. Accordingly, that portion of the Plaintiff's motion for a judgment on the pleadings is denied.

### 2. As to whether the ALJ's Decision Is Supported By Substantial Evidence

The Plaintiff argues that the ALJ's RFC finding is not supported by substantial evidence because the only evidence that contradicts Dr. Guy's opinion were the opinions of two consultants who each only examined the Plaintiff once. The Commissioner contends in opposition that the ALJ's decision is not only supported by those two doctors, but also by the MRIs, Dr, Kern's

examinations, the Plaintiff's own statements, and even Dr. Guy's examinations. The Court agrees that the ALJ's decision is supported by substantial evidence.

As stated above, substantial evidence means more than just a scintilla of evidence. "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Burgess*, 537 F.3d at 128 (internal citations and quotations omitted). The ALJ does not need to recite every piece of evidence that he or she relied upon. Instead, the Court may look to the record to find evidence that supports the ALJ's decision. *Cichocki*, 729 F.3d at 178 n.3.

The Court has detailed much of the evidence that supported the ALJ's decision, and the Court believes that there was substantial evidence to support the ALJ's decision. Specifically, the Plaintiff noted in her own paperwork and testified that she could cook, go out to socialize, clean, shop, make her bed, and wash laundry with assistance.

As to the medical evidence, the Plaintiff's June 21, 2012 MRI supported the ALJ's decision. The radiologist who took the MRI said that there was only mild disc bulging, and no evidence of recurrent disc herniation. Dr. Kern said that the same MRI showed some dehydration, but no evidence of instability. The MRI taken on July 13, 2013 showed that there were no changes in the Plaintiff's condition since the June 21, 2012 MRI.

Three different doctors stated that the Plaintiff had an RFC similar to the one found by the ALJ. Dr. Kern, the neurosurgeon who performed the Plaintiff's discectomy, and saw the Plaintiff on at least five different dates, assessed that the Plaintiff could perform light work with a 15 pound weight restriction. Dr. Thampi, a pain management doctor, reviewed all of Dr. Guy's reports on behalf of the Workers' Compensation Board and examined the Plaintiff, and assessed that the Plaintiff could work light duty with a twenty pound weight restriction. Dr. Manyam, an internist, found that the Plaintiff had only mild limitations.

After her surgery, the Plaintiff was only treated with physical therapy and epidural injections. Dr. Kern said that he would not perform any further surgeries on the Plaintiff because she did not require further surgery. Of importance, the Plaintiff stopped taking pain medication and as of the date of the administrative hearing, had not been to physical therapy in six months.

Therefore, the Court finds that there is substantial evidence to support the ALJ's finding that the Plaintiff possesses an RFC that allows her to perform her previous job, and that portion of the Plaintiff's motion for judgment on the pleadings is accordingly denied.

### 3. As to whether the ALJ Properly Evaluated the Plaintiff's Subjective Complaints of Pain

The Plaintiff's final argument is that the ALJ failed to properly evaluate the Plaintiff's complaints of pain. Specifically, the Plaintiff states that the ALJ's finding that the Plaintiff was not credible was not set forth with sufficient specificity. The Commissioner argues that the ALJ considered all of the Plaintiff's statements and appraised the credibility of the witness accordingly.

Although the "subjective element of pain is an important factor to be considered in determining disability," *Mimms v. Heckler,* 750 F.2d 180, 185 (2d Cir. 1984), "[i]t must be emphasized that 'it is the function of the Commissioner, and not a reviewing court, to pass upon the credibility of witnesses and to set forth clearly its findings which form the basis for its decision.'" *Saviano v. Chater*, 956 F. Supp. 1061, 1071 (E.D.N.Y. 1997), *aff'd,* 152 F.3d 920 (2d Cir. 1998) (Spatt, J.) (quoting *Stupakevich v. Chater,* 907 F. Supp. 632, 637 (E.D.N.Y. 1995)); *see also Aponte v. Sec'y, Dep't of Health and Human Serv.*, 728 F.2d 588, 591 (2d Cir. 1984) ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." (internal quotation and editing marks and citation omitted)).

The plaintiff must bolster complaints of pain by demonstrating, through medical findings, that an underlying condition does exist and that it would be reasonably expected to produce the symptomatology alleged. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.1529(b); 416.929(b); Social Security Ruling ("SSR") 88–13; *Gallagher v. Schweiker,* 697 F.2d 82, 84 (2d Cir. 1983). The ALJ found that there was an underlying condition, but did not believe that the condition was as severe as the Plaintiff claims.

If the claimant's symptoms indicate a more serious problem than is established by the medical evidence, other factors such as the claimant's daily activities and the location, duration, frequency, and intensity of the pain should be considered. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 88–13. As stated above, the medical evidence supported the ALJ's finding that the Plaintiff's condition is not as severe as she claims. *See Alcantara v. Astrue,* 667 F. Supp. 2d 262, 276 (S.D.N.Y. 2009) (ALJ must take subjective complaints into account only "to the extent that they are consistent with objective medical evidence"). Nonetheless, the ALJ also looked to the claimant's daily activities. The ALJ considered the Plaintiff's professed ability to drive, shop, socialize, dress, shower, visit her grandchildren, and go to church. Taking that into account, the ALJ found that the Plaintiff's complaints of severity were not credible.

Therefore, the ALJ's adverse credibility determination was not erroneous, and she properly evaluated the Plaintiff's complaints of pain. Accordingly, that portion of the Plaintiff's motion for judgment on the pleadings is also denied.

## III. CONCLUSION

After reviewing the parties submissions, and for the reasons stated above, the Plaintiff's motion for judgment on the pleadings pursuant to Rule 12(c) is denied; and the Commissioner's

cross-motion for judgment on the pleadings pursuant to Rule 12(c) is granted.  The Plaintiff's complaint is dismissed.

The Clerk of the Court is respectfully directed to close this case.


It is **SO ORDERED:**

Dated: Central Islip, New York

February 16, 2017

_____/s/ Arthur D. Spatt_____

ARTHUR D. SPATT

United States District Judge